```
            IN THE UNITED STATES DISTRICT COURT FOR
           THE DISTRICT OF MARYLAND, NORTHERN DIVISION


                                  *
POTOMAC RIVERKEEPER, INC.
                                  *
     Plaintiff,
                                  *
        v.                                 CIVIL NO.: WDQ-05-549
                                  *
NATIONAL CAPITAL SKEET AND
TRAP CLUB, INC., et al.           *

     Defendants.                  *

*    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION AND ORDER

Potomac Riverkeeper ("PRK") sued National Capital Skeet and Trap Club, Inc., (the "Club"), Maryland Department of Natural Resources ("MDNR") and C. Ronald Franks, Secretary of MDNR ("Franks") for violation of the Clean Water Act ("CWA")[1] and the Resource Conservation and Recovery Act ("RCRA")[2]. Pending is Frank's motion for summary judgment, and PRK's cross motion for summary judgment against all Defendants.[3] For the following reasons,

---

[1] 33 U.S.C. §§ 1251 *et seq.* (2005).

[2] 42 U.S.C. §§ 6901 *et seq.* (2005).

[3] MDNR also filed a motion to dismiss based upon sovereign immunity. As PRK concedes sovereign immunity, the motion to dismiss will be granted. *See* Plain. Mot. Summ. J. at 1. The Club has filed a motion to dismiss Counts I and II and opposed PRK's motion for summary judgment based upon identical arguments. As the sufficiency of PRK's allegations are detailed in the Court's discussion of its motion for summary judgment, the Court will not separately address the motion to dismiss. The Club has also filed a motion to strike certain exhibits relied upon by PRK in its motion for summary judgment. As the Club's motion lacks merit, the motion will be denied.

Frank's motion for summary judgment will be granted in part and denied in part, and PRK's cross motion for summary judgment will be denied.

## I.   BACKGROUND

Since 1954, the Club has owned and operated a skeet and trap range (the "Range")within Seneca Creek State Park in Montgomery County, Maryland.  *See* Complaint at ¶¶5, 8, 15.  In 1979, MDNR bought the Range  site. *See id.* at ¶16.  The Club and MDNR executed a Temporary Right of Entry License Agreement (the "Agreement") under which MDNR may approve maintenance and improvement of the Range and to restrict all skeet and trap shooting there.  *See* Complaint at ¶¶17, 20, 23, 23, 21; Franks Mot. Summ. J. Ex. 1 at ¶2.

The Range is adjacent to the Great Seneca Creek (the "Creek"),a tributary[4] to the Potomac River.  *See* Complaint at ¶¶6, 11.  The Range has nine shooting stations, configured in a straight firing line that sits atop a flat field overlooking the Creek.  *See id.* at ¶38.  At its nearest point, the Creek is within 300 to 400 feet of the firing line. *See* Franks Mot. Summ. J Ex. 1 at ¶3.  The field extends approximately 200 feet from the firing line to a steep drop-off that descends to the Creek's flood plain.  *Id.*, Complaint at ¶41.  Shooting at the Range has deposited lead shot in and about the Creek.  *See* Answer ¶¶20-24; Plain. Mot. Summ. J. Ex. 1 at ¶7.

PRK, a non-profit organization dedicated to restoring and

---

[4]A stream feeding into a larger stream or a lake.

protecting the Potomac River, claims that lead build up in the soil threatens the health of the land, water, plants and wildlife in violation of the CWA and RCRA.  On October 21, 2003, PRK served notice of its intent on the Defendants.

On February 25, 2005, PRK brought this suit.

## II. LEGAL DISCUSSION

A.   Motion for Summary Judgment

1. Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask... whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."  *Id.* at 252.

The Court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the opponent must produce evidence upon which a reasonable fact finder could rely.

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The mere existence of a "scintilla" of evidence is not sufficient to preclude summary judgment. *Anderson*, 477 U.S. at 252.

    2.  Clean Water Act

The CWA makes it unlawful for any person to discharge pollutants from any point source into navigable waters of the United States without obtaining a pollution discharge permit and complying with its terms. *See* U.S.C. §§1311 (a), 1342. A civil action may be brought against any person "alleged to be in violation of the pollution discharge permit requirement." 1365(a)(1). The "in violation of" element requires the allegation of a state of continuous or intermittent violation. *See Gwaltney of Smithfield, Ltd., v. Chesapeake Bay Foundation, Inc., et al.*, 484 U.S. 49, 53 (1987) ("Gwaltney I"). Continuous violations include the reasonable likelihood that a violation will recur. *See id.* Federal jurisdiction does not attach if the plaintiff does not allege ongoing violations. *See Gwaltney I.,* 484 U.S. at 56.

PRK has alleged that "the Defendants have violated the CWA because they have discharged a pollutant from a point source into navigable waters without a permit", *see* Complaint at ¶90, "without redesign, the shooting facility cannot operate without discharging a pollutant into navigable waters", *see id.* at ¶91, and "there is a reasonable likelihood that the Defendants will again operate the shooting facility in violation of the CWA because the shooting facility has not been permanently closed, shut down, or

redesigned," *see id. at ¶92;* PRK has sufficiently alleged an ongoing violation. *See Community of Cambridge Environmental Health and Community Development Group v. City of Cambridge,* 115 F.Supp. 2d 550, 557 (D. Md. 2000) (good faith allegations that violations will recur establish jurisdiction).

The defendant, however, may refute the allegations of ongoing violations by demonstrating that repetitions of pre-complaint violations are unlikely. *Sierra Club v. Union Oil Co.,* 853 F.2d 667,670-71. The plaintiff may survive summary judgment by offering evidence to support its allegations. *Gwaltney I*, 484 U.S. at 66. To win summary judgment, PRK must adduce evidence of a reasonable likelihood that the Defendants will violate the CWA again. *See Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171-72 (4th Cir. 1987) ("Gwaltney II"). The focus is upon the defendants' conduct at the time the plaintiff filed its complaint. *See Gwaltney I*, 484 U.S. at 64; *Gwaltney II*, 844 F.2d at 172.

Franks has adduced uncontradicted evidence that the Club is unlikely to continue to violate the CWA. In November 2003, nearly 18 months before suit was filed, the Club ceased operating the Range. *See* Complaint at ¶35. Under the Agreement, MDNR retains the authority to approve or disapprove any improvements in the Club's facilities. *See id.* at ¶25. MDNR instructed the Club that it would not authorize the reopening of the Range until it was physically reconfigured to ensure that no lead shot could reach

5

areas protected under the CWA.  *See* Franks Mot. Summ. J. Ex. 1 at ¶9; Ex. 2 at ¶3. Since this instruction, the Club has attempted to develop reconfiguration plans.  *See* Franks Mot. Summ. J. Ex. 1 at ¶9.  MDNR has repeatedly rejected plans that did not comply with the CWA.  *See id.* at ¶¶11, 14.

The Defendants' post-complaint behavior is also consistent with its decision not to allow the violations to recur. *Connecticut Coastal Fishermen's Association v. Remington Arms Co.*, 989 F.2d 1305, 1312 (2nd Cir. 1993) (post-complaint activities are relevant in determining likelihood of recurrence of violation). On March 2, 2005, MDNR's Regional Manager Major John Norbeck informed the Club that neither long term nor short term plans would be approved by MDNR unless the plans complied with the CWA. Id. at 19.  Further, the MDNR will not allow the Club to reopen until test-firing proves that there are no illegal lead shot deposits. *See* Franks Mot. Summ. J. Ex. 1  at ¶20.

Instead of presenting competing evidence, PRK merely speculates that the Defendants will again violate the CWA because their violations ceased only after receipt of the notice to sue letter.  This speculation, however, is not sufficient for summary judgment.  *See Remington Arms*, 989 F.2d at 1312 (when  a defendant comes forward with evidence that the defendant is unlikely to continue its violations, the plaintiff must present evidence from which a fact finder could find a likelihood of continuing violations).  Moreover, as early as the summer of 2003--months

6

before the notice to sue letter--MDNR instructed the Club to cease operating the three shooting lanes that were closest to the Creek. *See* Franks Mot. Summ. J. Ex. 1 at ¶¶5-6.  MDNR also rewrote the terms of the Club's use and occupancy agreement incorporating language that required the Club to comply with all federal and state environmental laws and regulations.  *See id.*

On this record, no reasonable juror could find that the Club would discharge lead shot in the future, thus, PRK's motion for summary judgment should be denied, and Franks' motion for summary judgement should be granted.[5]

3. Resource Conservation and Recovery Act

(a) Open Dumping Claim–42 U.S.C. § 6972(a)(1)(A)

The RCRA is a comprehensive environmental statute that governs the treatment, storage and disposal of solid and hazardous waste. *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996).  Its purpose is to minimize the present and future threat to human health and the environment. *See id.*  The RCRA prohibits open dumping which includes the disposal of solid waste in a flood plain. 40 C.F.R. §

---

[5] The Camp's motion to dismiss will be granted as to the CWA claim.  The Court will also enter summary judgment *sua sponte* in favor of the Camp. *See Amzura Enters. v. Ratcher*, 18 Fed. Appx. 95, 104 (4th Cir. 2001)(*citing Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000)) (The Court may enter summary judgment *sua sponte* in favor of the non movant when it is considering a properly noticed motion for summary judgment from the moving party on an identical issue).

7

257.3-1 (2005).[6]  Solid waste includes any garbage, refuse or other discarded material resulting from commercial operations or community activities.  *See* 40 C.F.R. § 257.2.  The phrase "other discarded material" has been interpreted to include material that has been disposed of, thrown away or abandoned, such as lead shot.  *See Safe Air v. Meyer*, 373 F.3d 1035, 1042 (9th Cir. 2004) (lead shot is a solid waste because it has been abandoned).

PRK contends that the Defendants have violated RCRA, because the lead shot is disposed into a flood plain.

To prevail, PRK must prove that there is a continuing violation.  *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1010 (11th Cir. 2004).  The Defendants do not dispute that lead shot lies within the flood plain, rather they argue that PRK has neither alleged nor proven a continuing violation because no additional lead shot has been introduced into the environment since November 2003.  This argument is unavailing.[7]

Unlike PRK's CWA claim, the Club's cessation of operations does not absolve it of RCRA liability.  The movement of previously disposed solid waste may constitute a violation of RCRA.  *See United*

---

[6]Disposal means the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid or hazardous waste into or on any land or water so that such solid or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 40 C.F.R. § 257.2.

A flood plain is the lowland and relatively flat areas adjoining inland and coastal waters. 40 C.F.R. § 257-3.1(b)(2).

[7]The Club's motion to dismiss the RCRA claim will be denied.

8

*States v. Waste Industries, Inc.*, 734 F.2d 159, 164-65 (4th Cir. 1984) (under RCRA, "disposal" does not require "active human conduct"); *accord Nurad, Inc. v. William E. Hooper & Sons, Co.*, 966 F.2d 837, 845(4th Cir. 1992). Whether ongoing conduct is required for an ongoing violation of the RCRA "turns on the wording of the prohibition alleged". *South Road Assocs. v. IBM*, 216 F.3d 251, 255 (2nd Cir. 2000).

The open dumping of solid waste within a flood plain involves "the washout of solid waste which poses a hazard to human life, wildlife, or land or water resources." 40 C.F.R. § 257.3-1. The "washout" of solid waste is defined as the "carrying away of solid waste by waters[.]" 40 C.F.R. § 257.3-1(b)(3). "Carrying away" does not require ongoing human conduct.

PRK has presented evidence suggesting that the previously discharged lead shot is continuously subjected to washouts, thereby creating an ongoing violation. *See* Answer at ¶17, Plain. Mot. Summ. J. Ex. B at ¶¶11-12, Ex. C at ¶¶11-12, Ex. D at ¶¶ 9-10, Ex. H at ¶28, Ex. O at ¶8. However, PRK must also prove that the solid waste subject to continuous washouts poses a hazard to wildlife, land and water resources. *See* 40 C.F.R. §257.3-1.

PRK has offered two Risk Assessments conducted by Earthtech, Inc., ("Earthtech") which report that lead levels within the flood plain are hazardous. *See* Plain. Mot. Summ. J. Exs. E, G. The reports also indicate that the disposal of lead shot is the cause of the elevated lead levels. *See* Plain. Mot. Summ. J. Ex. E

9

at 2-24 (associating the risk to wildlife with lead shot distribution, observing that the area outside the lead shot fallout area is expected to have lower lead levels and thus less risk to wildlife). The reports conclude that the lead levels pose a hazard to water, land and wildlife. *See* Plain. Mot. Summ. J. Ex. E at 2-12 (observing that soil lead concentrations in all sampled sites within the lead fallout area exceed ecological soil screening levels for plants, birds and mammals); Ex. G at 3(finding dissolved lead concentrations in the wetland at levels that may adversely affect aquatic life). The lead levels are also hazardous to surface water and humans. *See* Plain. Mot. Summ. J. Ex. E at 2-11 (lead concentrations exceeded risk-based screening criteria for mammals); 2-13 (elevated lead concentrations found in the tributaries to the Great Seneca Creek exceed the Maryland Water Quality Criterion).

The Defendants contend that there is a genuine dispute regarding whether the lead shot poses risk to the flood plain. In support they offer the affidavit of Richard K. Peddicord, Ph.D., a marine science biologist. Dr. Peddicord maintains that the reports conducted by Earthtech are insufficient to establish that the lead shot has caused harm to the environment. Specifically, Dr. Peddicord argues that further analysis of the property is warranted. For example, Dr. Peddicord, explains that high soil lead concentrations do not necessarily mean a risk of harm to the environment. *See* Franks Rply. Ex. 3 at ¶¶ 17-18. He states that such levels merely indicate that other factors--such as in-depth habitat resource

10

assessments--need to be examined. *See id.* Dr. Peddicord also questions Earthtech's methodology in calculating soil lead concentration levels. *See id.* at ¶15. He opines that the manner in which they evaluated the levels resulted in a gross overestimation. *See id.*

Although the Plaintiff asserts that the presence of lead shot poses a risk of harm to the aquatic resources, the reports note that the cause of the elevated concentration levels is unknown. *See* Plain. Mot. Summ. J. Ex. E at 2-11, 2-23, 2-24. Dr. Peddicord explains that there could be other lead sources and further analysis of the area should be conducted. *See* Franks Mot. Summ. J. Ex. 3 at ¶19. Additionally, the harm to humans from the presence of lead shot is disputed. Dr. Peddicord states that humans must either ingest or inhale lead before it can be harmful. *Id.* at ¶¶ 4, 13. There is no evidence that the air or wells on the property are now contaminated. *See id.*

Dr. Peddicord also refutes Earthtech's claims that wildlife and plants have been harmed. *See id.* at ¶¶ 8, 10, 16 (as some plants exclude uptake of lead, even if their roots are exposed to water with high levels of dissolved lead, there must be an analysis whether the plants within the flood plain can exclude lead);¶18, 21 (need to determine whether species susceptible to harm from lead reside in the flood plain);¶20 (need for more refined analysis whether animals such as earthworms have high levels of lead contamination).

As Dr. Peddicord's analysis raises a genuine dispute of material fact and also indicates a need for discovery in compliance with F.R.C.P. 56(f), summary judgment is inappropriate.

>  (b) Imminent and Substantial Endangerment Claim–42 U.S.C. §6972(a)(1)(B)

The RCRA provides a right of action to citizens against "any person...who contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or to the environment."  42 U.S.C. § 6972(a)(1)(B).

PRK contends that the lead shot on the property poses an imminent and substantial endangerment.  As a result, PRK seeks an injunction prohibiting the Defendants from opening the Range in violation of the RCRA, civil penalties, costs and attorney's fees and the clean up and remediation of the lead shot.  Franks argues that this claim is barred by sovereign immunity because the relief sought--with the exception of the injunction--will directly affect the State Treasury.  Therefore, he argues that the State of Maryland is the real party in interest.

Franks correctly asserts that Eleventh Amendment immunity may extend to state officials.  *See Keller v. Prince George's County*, 923 F. 2d 30, 32 (4th Cir. 1991) (when the essence of an action against a state official is to recover money from the state, the state is the real party in interest and the state official is

entitled to invoke the immunity). An exception to the Eleventh Amendment Immunity applies when a citizen sues to direct state officials to conform to federal law. *Antrican v. Odom,* 290 F.3d 178, 184 (4th Cir. 2002). If the official's violation is ongoing and prospective and injunctive relief is sought, the exception applies. *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998) (*citing Ex parte Young*, 209 U.S. 123, 149-150 (1908)). Here, PRK's claim is not based upon past acts, rather it is based upon the presence of lead shot that may be currently creating an imminent and substantial endangerment. *See Remington Arms*, 989 F. 2d at 1316 ("Under an imminent hazard citizen suit, the endangerment must be ongoing, but the conduct that created the endangerment need not be"). Furthermore, PRK's request for remediation is prospective. *See Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 309 (9th Cir. 1993) (order requiring a remedial plan to remove and dispose of previously deposited sediment was prospective).

To prevail, PRK must prove that the lead shot may present an "imminent and substantial endangerment to health or the environment." *Meghrig*, 516 U.S. at 486. An endangerment is a reasonable cause for concern that someone or something may be exposed to a risk of harm. *Adams v. NVR Homes, Inc.*, 135 F.Supp. 2d 675, 688 (D.Md. 2001) (*quoting Foster v. United States*, 922 F.Supp. 642, 661 (D.D.C. 1996)). Although proof of actual harm is not required, there must be proof of threatened harm which is neither

remote nor speculative. *Wilson v. Amoco Corp.*, 989 F.Supp. 1159, 1172 (D.Wyo. 1998); *Dague v. City of Burlington*, 935 F.2d 1343, 1355 (2nd Cir. 1991).

As discussed above, there is a genuine dispute whether the lead shot threatens the environment.  Accordingly, summary judgment is inappropriate.

## CONCLUSION

For the reasons discussed above, Frank's motion for summary judgment will be granted in part and denied in part; the Club's motion to dismiss will be granted in part and denied in part, and its motion to strike will be denied; the Court will grant summary judgment *sua sponte* to the Club on Count I; MDNR's motion to dismiss will be granted; and PRK's motion for summary judgment will be denied.


<u>September 27, 2005</u>                          <u>        /s/         </u>
Date                              William D. Quarles, Jr.
                                  United States District Judge